NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2026 IL App (4th) 250962-U

NO. 4-25-0962

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
June 25, 2026
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| CORY JENKINS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Rock Island County |
| McLAUGHLIN BODY COMPANY, | ) | No. 25MR31 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Jeffrey Scot McKinley, |
| | ) | Judge Presiding. |

JUSTICE CAVANAGH delivered the judgment of the court.
Justices Knecht and Grischow concurred in the judgment.

**ORDER**

¶ 1    *Held*:   (1) In this enforcement action pursuant to section 19(g) of the Workers'
Compensation Act (820 ILCS 305/19(g) (West 2024)), the circuit court
impermissibly modified the decision of the Illinois Workers' Compensation
Commission by requiring defendant to pay plaintiff the amount of the medical
bills in question rather than the amount actually paid in satisfaction of the medical
bills.

(2) Because the record lacks evidence that defendant refused to pay the amount
that defendant owed under the medical award of the Illinois Workers'
Compensation Commission's decision, there were no grounds for the assessment
of attorney fees and costs against defendant.

¶ 2    Pursuant to section 19(g) of the Workers' Compensation Act (Act) (820 ILCS

305/19(g) (West 2024)), the circuit court of Rock Island County entered a judgment in favor of

plaintiff, Cory Jenkins, and against defendant, McLaughlin Body Company, in the amount of

$165,353.54. Additionally, the court ordered defendant to pay plaintiff $41,316.32 in attorney

fees and $5,651.22 in costs. Defendant appeals.

¶ 3        In our *de novo* review, we reach two conclusions. First, the circuit court's judgment impermissibly modified the decision of the Illinois Workers' Compensation Commission (Commission) by requiring defendant to pay plaintiff the amount of the medical bills in question rather than the amount that had been paid in satisfaction of the medical bills. Second, because the record lacks evidence that defendant refused to pay the amount that defendant rightfully owed under the medical award of the Commission's decision, there were no grounds for the assessment of attorney fees and costs against defendant.

¶ 4        Therefore, we reverse the circuit court's judgment in plaintiff's favor and against defendant in the amount of $165,353.54 and in the amounts of $41,316.32 in attorney fees and $5,651.22 in costs. We remand this case with directions to enter a judgment in plaintiff's favor and against defendant in the amount of $54,546.05, without an assessment of attorney fees and costs.

¶ 5                                    I. BACKGROUND

¶ 6        On February 15, 2016, plaintiff, who was at that time an employee of defendant, sustained an accidental injury at work. He filed a claim for benefits under the Act, and an arbitrator with the Commission, Dennis O'Brien, held an evidentiary hearing on the claim.

¶ 7        On December 2, 2024, the arbitrator issued a decision, in which he found that the claim was compensable under the Act. Accordingly, he awarded workers' compensation benefits to plaintiff, including medical benefits.

¶ 8        The medical award provided as follows:

> "All of the bills introduced into evidence in Petitioner's Exhibit [No.] 2
> are related to [plaintiff's] February 15, 2016[,] injury, are reasonable and were
> necessitated to treat or cure [plaintiff's] injuries suffered in this accident with the

exception of the chest x-ray bill of August 14, 2017, for which there is no causal connection, and are to be paid pursuant to Sections 8(a) and 8.2 of the Act [(*id.* §§ 8(a), 8.2)].

[Defendant] is entitled to credit for those amounts it has paid to Concentra [Medical Center (Concentra)] for medical treatment rendered from March 31, 2016[,] through April 12, 2016.

[Defendant] is not entitled to any credit for amounts paid by [plaintiff's] subsequent employer's group health insurance policy pursuant to Section 8(j) [*id.* § 8(j)], as those payments were not contributed wholly or partially by [defendant]."

¶ 9 On the page after the medical award, the arbitration decision alerted the parties that "[u]nless a party files a Petition for Review within 30 days after receipt of this decision, and perfects a review in accordance with the Act and Rules [(50 Ill. Adm. Code 9010.10 *et seq.*)], then this decision shall be entered as the decision of the Commission." (Emphasis omitted.)

¶ 10 Thirty days passed, and no petition for review was filed with the Commission.

¶ 11 On February 25, 2025, pursuant to section 19(g) of the Act (820 ILCS 305/19(g) (West 2024)), plaintiff filed in the circuit court an application for entry of a judgment. He attached the arbitration decision to his application as exhibit No. 1. In paragraph 5 of his application, plaintiff alleged:

"5. Pursuant to the Arbitrator's decision, [defendant] *** was to pay [plaintiff] *** all medical bills submitted in Petitioner's Ex. #2, but for one, (1), (August 14, 2017, right shoulder x-ray amounting to $60.00). The medical bills were itemized and entered in evidence by [plaintiff]. Attached hereto as Exhibit

- 3 -

#2."

¶ 12          Exhibit No. 2, referenced in the final sentence of the quoted paragraph of the application, is a spreadsheet titled "SUMMARY OF TREATMENT & MEDICAL BILLS." To prevent confusion, we point out that the spreadsheet is not petitioner's exhibit No. 2, the exhibit to which the arbitrator's medical award referred when ordering that the medical bills in petitioner's exhibit No. 2 were to be paid pursuant to section 8(a) and 8.2. Instead, in its footer, the spreadsheet indicates that it is "PETITIONER'S EXHIBIT 1." At the arbitration hearing, there was petitioner's exhibit No. 1, and there was petitioner's exhibit No. 2. The spreadsheet attached to the application as exhibit No. 2 was petitioner's exhibit No. 1 at the arbitration hearing. The arbitration decision does not appear to mention petitioner's exhibit No. 1, even though, according to a parenthetical notation by the stenographer in the transcript of the arbitration hearing, petitioner's exhibit No. 1 was "admitted into evidence." Notwithstanding that notation by the stenographer, the transcript contains a discussion between the arbitrator and the defendant's attorney in which they agreed that petitioner's exhibit No. 1 would not be regarded as evidence (since it was merely a spreadsheet prepared by plaintiff's attorney, who was not a witness). Thus, instead of referencing petitioner's exhibit No. 1, the medical award referenced petitioner's exhibit No. 2, a stack of medical bills—which plaintiff did not attach to his application for entry of a judgment. Petitioner's exhibit No. 1 is merely a summary by plaintiff's attorney of the medical bills and their payment status.

¶ 13          The spreadsheet has a column labeled "Provider," in which 11 medical providers are listed. To the right of the "Provider" column are seven more columns, which are labeled "Date of Service," "Amount Billed," "Pd by WC," "Paid by UHC," "Write-offs WC UHC Untimely," "Pd by Client," and "Balance." (UHC is United Healthcare, the group health insurer

that had a contract with plaintiff's subsequent employer to provide coverage to its employees. The arbitration decision referred to United Healthcare in its paragraph denying defendant credit under section 8(j) for the medical payments that United Healthcare had made, since defendant had not contributed toward the United Healthcare plan.) At the bottom of the spreadsheet are totals. The total for the "Amount Billed" column is $167,340.54. The total "Write-offs," however, are $111,733.33. The total for the "Pd by WC" column is $1,985.27. The total for "Pd by UHC" is $47,594.83. The total for "Pd by Client" is $2,983.50. The total "Balance" is $3,003.61.

¶ 14 According to the application for entry of a judgment, what the medical award in the arbitration decision required defendant to do was pay the total "Amount Billed" of $167,340.54, less the $60 for the chest X-ray.

¶ 15 In its answer to the application, defendant disagreed with that interpretation of the arbitration decision. Instead, noting that "the amount of the award for medical bills is not specified in the Arbitration Decision and Order (See, Plaintiff Exh. 1)," defendant maintained that "the medical award sum is contingent on medical fee schedule calculations under Section 8.2 of the Act, credit allotted for Defendant's medical payments[,] and Plaintiff's group insurance rate adjustments required under Illinois law."

¶ 16 The answer included affirmative defenses. In the fourth affirmative defense, defendant alleged that, instead of refusing to pay the medical award, as plaintiff accused defendant of doing,

> "[a]t all times, the Defendant acted in good faith seeking to obtain the necessary
> medical billing documentation to calculate the medical fee schedule amounts due
> and to obtain medical payment information from Plaintiff's subsequent

employer's health insurance group to calculate the amount of the medical award in compliance with the Arbitration Decision."

¶ 17 On May 5, 2025, at a hearing on the application for entry of a judgment, the circuit court remarked, "[I]t's unfortunate that the Arbitrator's decision didn't include the final amount, but it does appear pretty clear what was awarded." Although, in its answer, defendant pleaded that it "need[ed] more information," the court did not "know what additional information [defendant] need[ed] because the order says [what was] to be included and [what was] to be excluded based on this document" (apparently meaning the spreadsheet). The court agreed with plaintiff that, under the plain terms of the arbitration decision, defendant's medical liability was to be determined simply by adding up the face amounts of the medical bills (except the bill for the chest X-ray and the bills from Concentra that defendant had already paid). In the court's view, defendant was obligated to pay plaintiff the total in the "Amount Billed" column of the spreadsheet.

¶ 18 Accordingly, on May 15, 2025, in a "JUDGMENT ORDER PURSUANT TO 820 ILCS 305/19(g)," the circuit court found as follows:

> "Pursuant to the final decision [of the Commission], [defendant] was to pay ***
> all medical bills as presented in [plaintiff's] SUMMARY OF TREATMENT
> AND MEDICAL BILLS with the exception of the 8/24/18 x-ray in the amount of
> $60.00. Defendant was to receive credit for the $1,979.00 payment to Concentra.
> All other bills were to be paid with Defendant receiving 8(a) and 8.2 credit."

Thus, the court entered a judgment in favor of plaintiff and against defendant in the amount of $165,353.54 "as payment of the medical bills."

¶ 19 Also, in its judgment order, the circuit court set a briefing schedule for the

remaining issue in the case: a request that the court assess attorney fees and costs against defendant. The court scheduled a hearing on that issue for June 11, 2025.

¶ 20    On June 6, 2025, invoking section 2-1203 of the Code of Civil Procedure (735 ILCS 5/2-1203 (West 2024)), defendant moved that the circuit court vacate or modify the judgment of May 15, 2025. The grounds that defendant raised for this requested relief were twofold. First, the medical bills that the arbitration decision had ordered defendant to pay—the medical bills comprising petitioner's exhibit No. 2—were not attached to plaintiff's application for entry of a judgment. Defendant argued that since petitioner's exhibit No. 2 was "not presented to the Court," it could not have been, as the court had put it, "pretty clear what was awarded." Second, by the terms of the arbitration decision, "[t]he medical bills were [']to be paid pursuant to Sections 8(a) and 8.2 of the Act.['] " Defendant argued that "[p]ayment of the face amounts of the medical bills, "ignoring the amounts of medical bill payments after adjustments, write offs, etc.," would be "a windfall to the Plaintiff" instead of payment pursuant to section 8(a). Defendant pointed out that, under section 8(a), as interpreted by *Tower Automotive v. Illinois Workers' Compensation Comm'n*, 407 Ill. App. 3d 427, 436-37 (2011), and *Perez v. Illinois Workers' Compensation Comm'n*, 2018 IL App (2d) 170086WC, ¶ 22, the amount the employer could be required to reimburse the employee for medical expenses was the amount actually paid to the medical service provider in satisfaction of the debts—which would not necessarily have been the amount originally billed. Given the two exhibits attached to plaintiff's application (the arbitration decision and the spreadsheet), defendant maintained that, instead of the amount the court had awarded, $165,353.54, the "medical bill reimbursement" that defendant owed plaintiff was $53,565.07, which was the sum of three amounts: $2,986.74 in "Unpaid related medical bills," $2,983.50 in "out of pocket payments" that plaintiff had made, and

$47,594.83 that United Healthcare had paid "under subsequent employer coverage." For that reason, on June 4, 2025, defendant's attorney notified plaintiff's attorney, by e-mail, that "[m]y client is *** issuing a check for the medical award and interest in the sum of $54,546.05" (calculating interest at 4.34% from January 2, 2025, when the Commission's decision became final, as $980.98).

¶ 21　　　After defendant filed its motion to vacate or modify the judgment, the parties agreed to an order extending the briefing schedule and rescheduling the next hearing for July 2, 2025.

¶ 22　　　On June 12, 2025, defendant filed an argument in opposition to the proposed assessment of attorney fees and costs. In its written argument, defendant recounted that on January 7, 2025, plaintiff's attorney e-mailed defendant's attorney, asking, "Please advise when your client will be sending us the check for the amounts dictated in the decision of 12/24/24 by Arbitrator O'Brien." On January 17, 2025, plaintiff's attorney followed up with another e-mail, observing that "We still have NOT received the settlement check" and requesting, "Please provide status." Copies of those e-mails were attached to defendant's written argument. In neither e-mail, defendant noted, did plaintiff "provide any calculations regarding the amount of the medical award due."

¶ 23　　　Evidently, the parties were in agreement, however, on the amounts for temporary total disability and partial permanent disability that the arbitration decision obligated defendant to pay. On January 21, 2025, defendant issued plaintiff's law firm a check in the amount of $41,228.05 in payment of those benefits, and it does not appear that the check was rejected.

¶ 24　　　Nevertheless, an interpretive disagreement arose over the amount of the medical award. Defendant's attorney assigned a paralegal, Timothy Swanson, to gather information that

defendant's attorney believed was needed to determine the amount of defendant's medical liability pursuant to section 8(a).

¶ 25        Swanson averred as follows in his affidavit. On February 20, 2025, he e-mailed plaintiff's attorney "to discuss the information required to secure the awarded medical bills requiring fee scheduling." ("Fee scheduling" was an allusion to section 8(a), which dictated, "The employer shall provide and pay the negotiated rate, if applicable, or the lesser of the health care provider's actual charges or according to a fee schedule." 820 ILCS 305/8(a) (West 2024). The Commission publishes "a fee schedule to be used in setting the maximum allowable payment for [medical] services covered under the Act." 50 Ill. Adm. Code 9110.90(a) (2012).) Also, on February 20, 2025, to further quote Swanson's affidavit, he

> "spoke by telephone with [plaintiff's] attorney regarding the need for medical information to fee schedule the medical bills. During the conversation, [plaintiff's] attorney demanded payment of $160,000.00 owed under the Decision or she was going to file her [section] 19(g) Motion on her desk. In discussing the medical bills owed, the [plaintiff's] attorney further said no bills were owed/outstanding and that the [plaintiff's] new employer's group health insurance paid all the bills."

Consequently, on February 27, 2025, Swanson e-mailed plaintiff's attorney some "[Health Insurance Portability and Accountability Act of 1996 (HIPAA) (42 U.S.C. § 1320d (2024)] Privacy Authorizations to secure medical billing records." In a further attempt to "collect the medical bills awarded under the Arbitration Decision," Swanson "prepared subpoenas to the medical providers listed in Petitioner's Exhibit [No.] 2."

¶ 26　　　　On June 9, 2025 (defendant further recounted in its written argument to the circuit court), defendant's attorney sent plaintiff's attorney a check in the amount of $54,546.05 as full payment of the medical award. Plaintiff's attorney acknowledged receipt of that check but rejected it, stating, " 'I am not accepting it as payment of the medical award because I do not agree with your interpretation.' " Instead, plaintiff's attorney now demanded $215,214.72 to satisfy the medical award.

¶ 27　　　　In his written argument to the circuit court in support of assessing attorney fees and costs against defendant, plaintiff complained that, in calculating the medical award as being only $54,546.05, "Defendant used, in part, the $47,594.83 paid by Plaintiff's subsequent employer's health insurance despite Arbitrator O'Brien['s] finding" that defendant was not entitled to credit for amounts paid by United Healthcare.  By plaintiff's interpretation, the arbitration decision clearly required defendant to pay the amount of the medical bills in petitioner's exhibit No. 2. Exhibit No. 2 of the application, plaintiff explained, was merely a convenient condensation of the "28 pages certified medical billing statements" (emphasis omitted) that made up petitioner's exhibit No. 2—billing statements that plaintiff now attached to his argument in support of an assessment of attorney fees and costs. Plaintiff contended that if defendant thought the arbitrator had erred by ordering defendant to pay the medical bills in petitioner's exhibit No. 2, defendant should have filed with the Commission a request for review instead of unreasonably disputing, months later, what the medical award plainly said: that defendant was to pay the face amounts of those medical bills. Rather than file a request for review in the "proper forum," defendant "offer[ed] a 'settlement' amount" that was, according to plaintiff, "in direct conflict with the Arbitrator's decision"—and then defendant "suggest[ed]"

(unconvincingly, in plaintiff's view) that "this payment [was] a 'good faith' attempt to resolve the issue."

¶ 28    On July 2, 2025, the circuit court held a hearing on defendant's section 2-1203 motion and plaintiff's request for attorney fees and costs. Defendant's attorney first made an argument in support of his section 2-1203 motion. He argued that, by the terms of the medical award, defendant was to pay the medical bills " [']pursuant to Section[ ] 8(a)['] " and that under section 8(a) the amount to be paid was "the negotiated rate," regardless of *who* had negotiated the rate (the employer, the insurer of a subsequent employer, or anyone else). Defendant's attorney rejected plaintiff's assertion that, in contravention of the arbitration decision, defendant was trying to obtain a credit for what United Healthcare had paid. Defendant's attorney contended that the rate that United Healthcare had negotiated with the medical providers—the amount that United Healthcare had paid them in settlement of the medical debts—was, under section 8(a), the *measure* of defendant's medical liability, not a *credit against* defendant's medical liability. Defendant maintained that "to allow them just to *** get the full amount of *** the medical bills as opposed to the payments that the actual bills paid, that's a windfall" and a windfall would be contrary to, rather than pursuant to, section 8(a). Defendant's attorney acknowledged that "[a]bsolutely [defendant is] obligated to reimburse [plaintiff] for" the payments made by United Healthcare. By defendant's calculation, though, "based upon Exhibit Number 2" of the application for entry of a judgment, *i.e.*, plaintiff's own spreadsheet, the reimbursement should be "$53,000 and some change."

¶ 29    Plaintiff's attorney responded that this offer of reimbursement was not in good faith, stating:

"I've got a dollar amount that they used my summary for, and they specifically used the number that Arbitrator O'Brien said they weren't entitled to.

I didn't get [a section] 8(a) or 8(j) calculation. I got nothing except, [']Oh, we'll pay you what his subsequent employer's insurance company paid.['] That's not what the arbitrator said. The arbitrator specifically said you don't get credit for that under [section] 8(j)."

An alternative measure of payment, the fee schedule, was inapplicable, plaintiff's attorney argued, because

"the providers in this case have already been paid. There's no one to pay except for a couple of bills that—and yeah, they get the fee schedule for whatever bills are unpaid; but we're talking about paid medical bills.

So *** now the question becomes, what do they owe? Well, they're *** arguing that they're entitled to the credits given by the group—for the group health payments made by a subsequent employer."

¶ 30        The circuit court asked plaintiff's attorney what the arbitrator meant, then, when he wrote that all the medical bills in petitioner's exhibit No. 2 were " [']to be paid pursuant to Sections 8(a) and 8.2.['] " "What is the point of saying [those] last few words?" the court asked. Plaintiff's attorney answered:

"Well, because it's boilerplate. In every workers' comp decision, they say you pay the medical pursuant to [section] 8(a) and [section] 8.2 because *** that's a framework *** for paying medical bills. But *** where the bills are already paid, *** then the issue becomes whether they get  [a section] 8(j) credit. ***

- 12 -

[T]he only credit allowable for medical is [section] 8(j), *** where the employer's sponsored plan pays the medical."

It was not defendant's sponsored health plan that had paid the medical bills, plaintiff's attorney observed, but, rather, it was a subsequent employer's sponsored health plan that had paid them. Therefore, in the view of plaintiff's attorney, defendant had no reasonable grounds for claiming a credit for what United Healthcare had paid. Under section 8(j), plaintiff's attorney argued, the rate negotiated by the subsequent employer (or the subsequent employer's insurance carrier, United Healthcare) had "nothing to do with [defendant]."

¶ 31        The circuit court essentially agreed with plaintiff's argument that, by equating its own obligation with the amount that United Healthcare had paid, defendant was trying to obtain a credit clearly denied by the arbitration decision. The court told defendant's attorney:

"So I know your argument *** is that you are not seeking the credit; but of course you are, because if you're relying on [']all *** our responsibility is only to pay that 47 back as a form of reimbursement,['] how is that not a credit?

*** [W]hether you call it reimbursement or credit, at the end of the day, it's the same thing. So that clearly is not what the arbitrator intended."

The court decided, therefore, that "the original judgment stands." In other words, the court denied the section 2-1203 motion.

¶ 32        Then the circuit court added:

"I mean, I was convinced last time by the information that [plaintiff's attorney] provided to the Court that she had exerted considerable time in trying to come to a resolution with, as I mentioned before, little or no response. And so

- 13 -

even the payment that was made, as she said, has been very long and [*sic*] coming." Consequently, not only did the court deny defendant's motion to vacate or modify the judgment, but the court granted plaintiff's request for attorney fees and costs. The court awarded plaintiff attorney fees in the amount of 20% of the entire award, based upon the 20% contingency fee agreement that plaintiff had with his attorney, and the court also awarded plaintiff the purported costs of the arbitration. "So $41,316.32, as well as the cost of the arbitration proceeding, $5,651.22. And then that would be the full amount awarded," the court ruled. The court requested that plaintiff's attorney draft an order accordingly.

¶ 33　　　　On August 13, 2025, the circuit court signed and filed the final judgment order, which denied the section 2-1203 motion and reaffirmed the judgment in the amount of $165,353.54. Also, "[d]ue to the failure of Defendant to pay the settlement as ordered," the court assessed the following penalties against defendant pursuant to section 19(g): "Attorney fees in the arbitration proceedings of $41,316.32" and "Costs of $5,651.22 from the arbitration proceedings."

¶ 34　　　　On September 10, 2025, defendant filed its notice of appeal.

¶ 35　　　　　　　　　　　　　II. ANALYSIS

¶ 36　　　　A. Allowable Statutory Interpretation in a Proceeding Pursuant to Section 19(g)

¶ 37　　　　If an employer fails or refuses to pay a final award by the Commission, section 19(g) of the Act (820 ILCS 305/19(g) (West 2016)) provides a means of reducing the award to an enforceable judgment (the Commission's award is not itself a judgment). *Aurora East School District v. Dover*, 363 Ill. App. 3d 1048, 1054 (2006). All the circuit court may do in a section 19(g) proceeding is "determine[ ] whether the section's requirements have been met" and enter a

- 14 -

judgment accordingly. *Id.* at 1055. "The statute provides in absolute terms that, upon presentation of a certified copy of an award or decision to the circuit court, 'the court shall render a judgment in accordance therewith.' " *Ahlers v. Sears, Roebuck Co.*, 73 Ill. 2d 259, 268 (1978) (quoting Ill. Rev. Stat. 1975, ch. 48, par. 138.19(g)). The court may not scrutinize the legality of the Commission's decision or "construe the statute." *Id.*

¶ 38        But what if construal of the Commission's decision for the purpose of reducing it to a judgment requires construal of the Act, as when the Commission's decision expressly provides (like the medical award in this case) that an obligation is to be paid "pursuant to" a specified section of the Act, which is to say, in conformity with that section? See Merriam-Webster's Collegiate Dictionary 1011 (11th ed. 2020) (defining "pursuant to" as "in carrying out: in conformity with: ACCORDING TO"); *Burns v. Industrial Comm'n*, 95 Ill. 2d 272, 277 (1983) (remarking that, in the section 19(g) proceeding, "it was necessary for the circuit court to interpret the award in order to render a judgment" and that "since there was obviously an irreconcilable inconsistency within the decision, it was only logical for the court to try to determine what the arbitrator had actually awarded").

¶ 39        A similar question was raised in *Morse v. Casey's General Store*, 2021 IL App (5th) 200157-U. In that case, the employer entered into a workers' compensation settlement in which the employer promised " 'to pay the previously incurred reasonable, necessary, and causally related medical expenses pursuant to the Medical Fee Schedule as set forth in the Act.' " *Id.* ¶ 10. The Commission approved the settlement agreement, making it an award by the Commission (*id.* ¶ 32), and because neither party filed a petition for review with the Commission (*id.* ¶ 10), the award became "conclusive" (820 ILCS 305/19(b) (West 2018)). Six months after the Commission's approval of the settlement agreement, the claimant filed an application under

section 19(g) in the circuit court. *Morse*, 2021 IL App (5th) 200157-U, ¶ 11. In her application, she alleged that although the settlement agreement, approved by the Commission, required the employer to " 'pay all medical bills according to the provisions of the Fee Schedule contained in Section 8.2 of [the Act],' " the employer had failed to pay a medical bill in the amount of $5,206.72 for implants. *Id.* After an evidentiary hearing, the circuit court found that the employer had violated the settlement agreement by failing to pay the bill. See *id.* ¶ 28. The court ordered the employer to pay the bill (*id.*) and assessed attorney fees and costs against the employer (*id.* ¶ 29).

¶ 40      On appeal, the employer in *Morse* argued that the circuit court had exceeded its authority under section 19(g) because to determine the amount the employer owed under the settlement agreement, the court had to "construe the Act." (Internal quotation marks omitted.) *Id.* ¶ 36. "While the settlement agreement did not provide a specific dollar amount of medical expenses, the agreement specified *** that the amount should be calculated as provided in section 8(a) and the fee schedule set forth in section 8.2 of the Act." *Id.* Thus, "enter[ing] a judgment in accordance" with the settlement agreement (820 ILCS 305/19(g) (West 2018)) required interpreting and applying sections 8(a) and 8.2—for the settlement agreement, which had become the Commission's decision, directed the reader to apply those sections of the Act. But the supreme court had cautioned in *Ahlers*, "The court may not *** construe the statute." *Ahlers*, 73 Ill. 2d at 268. The appellate court concluded, in so many words, that this prohibition in *Ahlers* was inapplicable if the Commission's decision directed the employer to comply with a specific provision of the Act, for then, to perform its duty under section 19(g), the circuit court would have no choice but to construe and apply the statutory provision the Commission referenced in its decision. *Morse*, 2021 IL App (5th) 200157-U, ¶ 36. If the Commission's

decision directs a reader to apply a section of the Act by acting pursuant to that section, the compliant reader has no alternative but to interpret and apply that section. "Under these circumstances," the appellate court held, "the court did not exceed the scope of its limited jurisdiction by looking to the Act for guidance in calculating the amount owed under the settlement agreement." *Id.*

¶ 41                                        B. Our Standards of Review

¶ 42        Essentially, this appeal raises three questions. First, what was the amount of the medical award? Second (and the answer to this second question will depend largely on the answer to the first), should attorney fees and costs have been assessed against defendant? Third, if the answer to the second question is yes, were the amounts of the attorney fees and costs excessive? At the outset, we should be clear what our standard of review is as to each of those questions. (Incidentally, it might be helpful to explain why we, instead of the Workers' Compensation Commission Division (Division), are hearing this appeal. Under Illinois Supreme Court Rule 22(i) (eff. Aug. 2, 2023), the Division is to "hear and decide all appeals involving proceedings to review orders of the *** Commission." Because an appeal from a judgment in a section 19(g) proceeding seeks review of the circuit court's judgment rather than the Commission's decision, the appeal is before us instead of the Division. See *Aurora East*, 363 Ill. App. 3d at 1055 n.4.)

¶ 43        1. *Independent Standard of Review When Interpreting the Medical Award*

¶ 44        The arbitration decision is a written document, and "[g]enerally speaking, the construction of a written document presents a legal question" (*Hernandez v. Schittek*, 305 Ill. App. 3d 925, 933 (1999)), which we decide *de novo* (see *Beelman Trucking v. Illinois Workers' Compensation Comm'n*, 233 Ill. 2d 364, 370 (2009)).

¶ 45     To the extent that interpretation of the arbitration decision requires interpretation of the Act, our interpretation of the Act is likewise *de novo*. See *Hamilton v. Industrial Comm'n*, 203 Ill. 2d 250, 254-55 (2003).

¶ 46     2. *Independent Standard of Review on Whether Defendant Refused to Pay*

¶ 47     Section 19(g) provides:

> "In a case where the employer refuses to pay compensation according to such final award or such final decision upon which such judgment is entered the court shall in entering judgment thereon, tax as costs against him the reasonable costs and attorney fees in the arbitration proceedings and in the court entering the judgment for the person in whose favor the judgment is entered." 820 ILCS 305/19(g) (West 2024).

Thus, a refusal to pay compensation in accordance with the Commission's decision is what triggers liability for reasonable attorney fees and costs.

¶ 48     In *Radosevich v. Industrial Commission*, 367 Ill. App. 3d 769, 774 (2006), the appellate court held, "Whether an employer has refused to pay an arbitration award is a question of fact. Factual determinations made by the circuit court will not be overturned unless against the manifest weight of the evidence." So, *Radosevich* applied a deferential standard of review to the factual issue of whether the employer had refused to pay the arbitration award. See *Mahan v. Marion Police Pension Board*, 2023 IL App (5th) 210426, ¶ 29 (Manifest weight of the evidence "is a considerably deferential standard.").

¶ 49     Whenever a deferential standard of review is applied to the circuit court's factual findings, there are two reasons for doing so:

"(1) having heard and observed the live witnesses' testimony, the circuit court is in a superior position to resolve alleged inconsistencies and conflicts in the witnesses' testimony, as well as to weigh the testimony and determine the credibility of the witnesses, and (2) the reviewing court never has the full benefit of hearing and observing the live witnesses' testimony." *People v. Morgan*, 2025 IL 130626, ¶ 21.

¶ 50 That twofold rationale is inapplicable if the circuit court heard no live witness testimony. Therefore, the supreme court has held that if "the parties presented only documentary evidence on [a factual] issue"—if "the evidence before a trial court consists of depositions, transcripts, or evidence otherwise documentary in nature"—the standard of review is not deferential but *de novo*. (Internal quotation marks omitted.) *People v. Muhammad*, 2025 IL 130470, ¶ 50. If the circuit court heard no live witness testimony, "the reviewing court stands in the same position as the circuit court and may, therefore, review the record *de novo*." *Morgan*, 2025 IL 130626, ¶ 21.

¶ 51 In determining, in the present case, whether defendant had refused to pay the medical award, the circuit court heard no live witness testimony and, thus, had no opportunity to weigh the credibility of witnesses by observing their demeanors. See *Wade v. Stewart Title Guaranty Co.*, 2017 IL App (1st) 161765, ¶ 59 ("The manifest weight of the evidence standard affords great deference to the trial court because the trial court is in a superior position to determine and weigh the credibility of the witnesses, observe witnesses' demeanor, and resolve conflicts in their testimony."). "[W]here, as here, the circuit court's decision is based on documentary evidence and not live testimony, a *de novo* review is appropriate." *Defante v. Big Tuna's Inc.*, 2026 IL App (1st) 250421-U, ¶ 40.

¶ 52          3. *Deferential Standard of Review on the Amount of Attorney Fees and Costs*

¶ 53          Under section 19(g), attorney fees and costs must be "reasonable." 805 ILCS 305/19(g) (West 2016). Although we decide *de novo* whether defendant refused to pay the arbitration award and thereby became liable, under section 19(g), for attorney fees and costs, we would review the *amount* of attorney fees and costs for an abuse of discretion. See *Salier v. Delta Real Estate Investments, LLC*, 2023 IL App (1st) 181512-U, ¶ 47.

¶ 54          For reasons we will soon explain, however, we have arrived at the conclusion, *de novo*, that defendant did not refuse to pay the medical award. With the statutory prerequisite for attorney fees and costs unfulfilled, an assessment of attorney fees and costs against defendant in any amount would be an abuse of discretion. There should have been no assessment of attorney fees and costs against defendant.

¶ 55          C. The Amount of Defendant's Medical Liability Under the Arbitration Decision

¶ 56          Defendant points out that, in "enter[ing] a judgment in accordance" with the Commission's decision (820 ILCS 305/19(g) (West 2024)), the circuit court lacks authority to modify (or otherwise review) the Commission's decision (see *Ahlers*, 73 Ill. 2d at 268). And yet, defendant argues, the circuit court modified the medical award by entering a judgment against defendant in "the total bill amounts for the medical services," $165,353.24, thereby effectively deleting the qualification in the medical award that the medical bills were "to be paid pursuant to Section[ ] 8(a)" and bestowing a "windfall" on plaintiff that the Commission never intended. Defendant criticizes the court for "ignor[ing] the provisions and parameters of Section 8(a), which limit an employer's liability [to] the actual payments made in satisfaction of the medical bills" after write-offs. Defendant maintains that, "*pursuant to Section[ ] 8(a),*" as the medical award puts it, the judgment should have been $53,565.07. (Emphasis added.) (Although there are

unpaid medical bills and, under section 8(a), strictly speaking, those bills should be paid in accordance with the Commission's fee schedule, defendant agrees, for the sake of simplifying matters, to pay the face amount of those bills, without "fee scheduling" them. As for the paid medical bills, though, defendant maintains that the amount it owes plaintiff as reimbursement under section 8(a) is the amount that was paid to the medical providers in satisfaction of those bills.)

¶ 57 Plaintiff counters that, contrary to defendant's assertion, "the judgment amount is specifically based on the language of the medical award." The arbitration decision plainly ordered defendant to pay the medical bills in petitioner's exhibit No. 2, plaintiff reasons, and those bills indisputably added up to $165,353.54. Plaintiff argues that "[i]f Arbitrator O'Brien had intended to award only the amounts that the subsequent group health insurer had paid, surely[ ] he would have said as much."

¶ 58 But the arbitrator did say as much by stating that the medical bills in petitioner's exhibit No. 2 were "to be paid pursuant to Section[ ] 8(a)." If the arbitrator had intended that defendant pay plaintiff $165,353.54, "surely[ ] he would have said as much," to borrow plaintiff's words. But, instead, the arbitrator wrote that "[a]ll of the bills introduced into evidence in Petitioner's exhibit [No.] 2 ***[,] with the exception of the chest x-ray bill ***, are to be paid pursuant to Sections 8(a) and 8.2 of the Act."

¶ 59 Section 8(a) of the Act provides as follows:

"(a) The employer shall provide and pay the negotiated rate, if applicable, or the lesser of the health care provider's actual charges or according to a fee schedule, subject to Section 8.2, in effect at the time the service was rendered for all the necessary first aid, medical and surgical services, and all necessary

- 21 -

medical, surgical and hospital services thereafter incurred, limited, however, to that which is reasonably required to cure or relieve from the effects of the accidental injury." 820 ILCS 305/8(a) (West 2024).

¶ 60        Pursuant to section 8(a), then, the employer must pay *either* (1) the rate negotiated with the medical provider *or* (2) the lesser of (a) the medical provider's actual charges or (b) the amount in the Commission's fee schedule. *Id.* "Only where medical bills have *not* yet been paid by the third-party insurer is it necessary to analyze the actual charges against the fee schedule." (Emphasis in original.) *Aim National Lease v. Illinois Workers' Compensation Comm'n*, 2026 IL App (1st) 250494WC-U, ¶ 85. According to representations that plaintiff made to the arbitrator and the circuit court in petitioner's exhibit No. 1 (exhibit No. 2 of the application), the third-party insurer, United Healthcare, had already paid all the medical bills in petitioner's exhibit No. 2, except for $2,983.50 that plaintiff paid out of pocket. Thus, pursuant to section 8(a), the only relevant measure of defendant's medical liability is "the negotiated rate" (820 ILCS 305/8(a) (West 2024)). See *Aim National*, 2026 IL App (1st) 250494WC-U, ¶ 85. The court's judgment of $165,353.54 in plaintiff's favor and against defendant is not the rate that United Healthcare negotiated with the medical providers and, therefore, is not payment of the medical bills "pursuant to Section[ ] 8(a)," as the language of the medical award requires.

¶ 61        According to plaintiff, though, the phrase "pursuant to Sections 8(a) and 8.2" was " 'boilerplate' " and applicable only to the unpaid medical bills. On the contrary, under the language of the medical award, this qualifying phrase applied to all the medical bills: "*All* of the bills introduced into evidence in Petitioner's exhibit [No.] 2 *** are to be paid pursuant to Sections 8(a) and 8.2." (Emphasis added.)

¶ 62    Because section 8.2 (820 ILCS 305/8.2 (West 2024)) pertains to fee scheduling, the facts of this case afford no occasion for applying section 8.2. Therefore, apart from the unpaid medical bills, which defendant has agreed to pay in their face amount, the only remaining measure of defendant's medical liability, given the qualifying phrase that the medical award used—"pursuant to Section[ ] 8(a)"—is the negotiated rate that United Healthcare paid. See *Aim National*, 2026 IL App (1st) 250494WC-U, ¶ 85. "By paying, or reimbursing an injured employee, for the amount actually paid to the medical service providers, the plain language of the statute is satisfied." *Tower Automotive*, 407 Ill. App. 3d at 437.

¶ 63    So, we agree with defendant that by entering a judgment in the amount of $165,353.54, which was the total amount originally billed instead of the amount that United Healthcare paid in satisfaction of the medical bills, the circuit court effectively deleted the phrase "pursuant to Section[ ] 8(a)" from the medical award and thereby modified the medical award, bestowing a windfall upon plaintiff that was inconsistent with the text of the medical award.

¶ 64    To be sure, the arbitration decision directed that the medical bills in petitioner's exhibit No. 2 were "to be paid," and according to petitioner's exhibit No. 1, they totaled $165,353.54. What plaintiff appears to overlook, however, is that the employer's reimbursement of an injured employee for the amount actually paid in satisfaction of the medical bills, after write-offs, counts as *paying the medical bills*—regardless of the higher originally billed amounts. See *id.* ("By paying, or reimbursing an injured employee for the amount actually paid to the medical service providers, the plain language of [section 8(a)] is satisfied."). Once the third-party insurer (to whom the employer did not contribute) pays the injured employee's medical bills, the bills cease to exist, and then the only way the employer can "pay" them, so to speak, is to reimburse the employee—and reimbursing the employee means paying the employee what he or

she (through the third-party insurer) actually paid. This is the only reasonable interpretation of the medical award.

¶ 65                              D. The Red Herring of Section 8(j) Credit

¶ 66          Plaintiff acknowledges having received a check in the amount of $54,546.05 from defendant as intended payment of the medical award. Plaintiff complains that, in calculating the amount of this check (which plaintiff rejected), defendant

> "used, in part, the $47,594.82[ ] paid by Plaintiff's subsequent employer's health insurance despite Arbitrator O'Brien finding: 'The Respondent (now Defendant)[ ] is not entitled to any credits for amounts paid by Petitioner's subsequent employer's group health insurance policy pursuant to Section 8(j), as those payments were not contributed wholly or partially by Respondent.' "

¶ 67          Plaintiff does not seem to understand what a credit is. A "credit" is "an accounting entry" representing "[a] deduction from an amount due." Black's Law Dictionary (12th ed. 2024) (credit). Section 8(j) of the Act (820 ILCS 305/8(j) (West 2016)) provides for a credit toward an employer's obligations under the Act if the injured employee received benefits under any group plan covering nonoccupational disabilities to which the employer contributed. Thus, if the employer's obligations under the Act were, say, $100,000 and the employee received $30,000 in benefits under a group plan to which the employer had contributed, the employer would be entitled to a credit in the amount of $30,000, reducing the employer's obligations under the Act to $70,000. In the present case, defendant does not claim a *credit* for United Healthcare's payment of $47,594.82. Defendant does not claim that United Healthcare's payment of $47,594.82 in satisfaction of the medical bills entitles defendant to a deduction of $47,594.82 from the amount that defendant otherwise would owe. Rather, defendant claims that, "pursuant

to Section[ ] 8(a)," as the medical award phrases it, United Healthcare's payment of $47,594.82 is the *measure* of what defendant owes plaintiff for medical treatment.

¶ 68    It is true that United Healthcare's negotiation of the medical bills from $165,353.54 down to $47,594.82 was beneficial to defendant, considering that defendant was obligated to pay plaintiff whatever United Healthcare had paid. That fact, however, does not make the $47,594.82 a credit, properly speaking, or a deduction from what defendant owes. Rather, what defendant owes in the first place is what United Healthcare paid. In other words, what United Healthcare paid is not a subtraction from defendant's debt column; it *is* the debt column. Indisputably, an obligation of $47,594.82 is better for defendant than an obligation of $165,353.54. Even so, although every credit is financially beneficial to the person receiving it, not everything financially beneficial that happens to a person is a credit.

¶ 69                    E. Reasonableness and Necessity

¶ 70    Plaintiff argues:

"Arbitrator O'Brien could have referred to the amount of the collateral source payments as the amount owed but didn't. He could have found the amount of the collateral source payments to be the 'reasonable and necessary amount of medical to treat [plaintiff's] work injuries, but he didn't. Instead, he found that "*All of the bills introduced into evidence in Petitioner's Exhibit [No.] 2 are related to Petitioner's February 15, 2016 injury, are reasonable and were necessitated to treat or cure [plaintiff's] injuries suffered in this accident*." (Emphasis in original.)

¶ 71    This argumentative strategy could be turned against plaintiff. To borrow phraseology from plaintiff, the arbitrator "could have" simply ordered defendant to pay plaintiff

- 25 -

$165,353.54, but the arbitrator "didn't do so." For that matter—what is even more problematic for plaintiff's literalistic approach—the arbitrator did not specifically order defendant to pay *plaintiff* anything. Instead, the arbitrator ordered that the medical bills in petitioner's exhibit No. 2 were "to be paid pursuant to Sections 8(a) and 8.2," even though plaintiff had represented to the arbitrator and defendant, in petitioner's exhibit No. 1, that those medical bills had mostly been paid.

¶ 72          So, plaintiff needs to explain how defendant is supposed to pay medical bills that already have been paid and that consequently no longer exist. Take, for example, one of the medical bills in petitioner's exhibit No. 2, a bill from NuVasive Clinical Services (NuVasive) for $4,230. Literally, paying that bill would mean sending NuVasive a check in the amount of $4,230. Paying plaintiff would not pay NuVasive's bill, for plaintiff is not NuVasive. Presumably, though, if defendant sent NuVasive a check, NuVasive would send the check back, stating something to the effect of, "Our records show that plaintiff's account balance is zero." It is impossible to pay a bill that is already paid, for the payment eliminated the bill. Therefore, plaintiff must resort to implication, it would seem—the same way that defendant resorts to implication. Plaintiff would have to read into the medical award a right of reimbursement: through his third-party insurer, plaintiff discharged defendant's obligation of paying the medical bills, and, therefore, defendant should pay him back. But paying plaintiff back would mean paying plaintiff what he paid, "reliev[ing] [him] of the costs and burdens of such care" (*Tower*, 407 Ill. App. 3d at 438), not bestowing upon him a windfall. Plaintiff finds in the medical award an implied right to be paid back—and justifiably so. But then plaintiff cannot reasonably turn around and criticize defendant for finding an implied limitation of that right to the amount

plaintiff actually paid, especially considering the arbitrator's use of the qualifying phrase "pursuant to Section[ ] 8(a)."

¶ 73    Granted, the arbitration decision could be read as finding that the medical bills in petitioner's exhibit No. 2 were reasonable and necessary in their *amounts*. This is how plaintiff reads it. We do not see, however, why such a finding would matter if the right that should be read into the medical award is a right of plaintiff to be reimbursed whatever negotiated amounts that he (through his bargained-for insurance policy) actually paid the medical providers in satisfaction of their bills.

¶ 74    F. No Evidence of Refusal to Pay What Was Owed

¶ 75    Under section 19(g), the prerequisite to an assessment of attorney fees and costs is that the "employer refuses to pay compensation according to such final award or such final decision upon which such judgment is entered." 820 ILCS 305/19(g) (West 2024). We see no evidence of any such refusal.

¶ 76    The month after plaintiff demanded payment, defendant began making inquiries of plaintiff to determine how much was owed under the sections of the Act that the medical award referenced, sections 8(a) and 8.2. We have no reason to believe that these inquiries were dishonest or that they were intended to be delaying tactics. Plaintiff was unwilling to participate in these inquiries beyond adding up the amounts of the medical bills in petitioner's exhibit No. 2. The only refusal by defendant was a refusal to pay the windfall of $165,353.54 (or, later, $215,214.72) that plaintiff demanded.

¶ 77    On June 9, 2025, defendant issued plaintiff's law firm a check in the amount of $54,546.05, based on the amount that United Healthcare had paid the medical providers, and plaintiff refused the check. Granted, it was some five months after the expiration of the 30-day

period for review when defendant issued the check. Possibly, though, defendant needed time to confirm the amount that United Healthcare had paid the medical providers. It is unclear whether defendant succeeded in confirming that amount or eventually decided just to accept the representations of plaintiff's attorney in petitioner's exhibit No. 1. In any event, it probably would not have mattered if defendant had issued the check for $54,546.05 the day after the arbitrator issued his decision—plaintiff would have refused the payment because it was not in the total amount the medical providers had originally billed. It appears that the only unreasonable refusal in this case is plaintiff's refusal to budge from his position that defendant owed him three or four times the actual amount that was paid in satisfaction of the medical bills.

¶ 78        We do not understand plaintiff as disputing that if defendant's interpretation of the medical award is correct—if the negotiated rate is the measure of defendant's medical liability—$54,546.05 is the correct calculation of what defendant owed on June 9, 2025, when defendant issued to plaintiff's attorney a check in that amount.

¶ 79                                III. CONCLUSION

¶ 80        For the reasons stated, we reverse the circuit court's judgment in plaintiff's favor and against defendant in the amount of $165,353.54 and in the amounts of $41,316.32 in attorney fees and $5,651.22 in costs. We remand this case with directions to enter a judgment in plaintiff's favor and against defendant in the amount of $54,546.05, without an assessment of attorney fees and costs.

¶ 81        Reversed and remanded with directions.